SAVOIE, Judge.
This appeal arises from a suspensive appeal filed by Louisiana Insurance Guaranty Association (hereafter LIGA), the defendant/appellant; and a devolutive appeal filed by Guaranty Bank & Trust Company (hereafter Guaranty), the plaintiff/appellant. The original defendants were Ideal Mutual Insurance Company (Ideal), Credit Protection Insurance Agency, Inc. (CPI), Allied Fidelity Insurance Company (AFIC), Allied Fidelity Corporation (AFC), and Robert C. Bundren. CPI entered into bankruptcy in January of 1983. Ideal was placed in liquidation in the State of New York on February 7, 1985 and, as a result, LIGA became obligated to assume any obligation of Ideal under the miscellaneous indemnity bond issued to Guaranty. On July 15, 1986, AFIC was placed in liquidation in the State of Indiana and all Louisiana proceedings against AFIC were stayed. AFC has filed under Chapter 7 in the Bankruptcy Courts and a stay order is in effect for AFC also.
In July, 1981, CPI approached Guaranty to solicit its participation in an automobile loan insurance program known as “Loan-Power”. Simply stated, under LoanPower Ideal acted as “insurer” by paying the balance due on the vehicle if the borrower defaulted. Guaranty’s participation in the program began when CPI arranged for the issuance of a miscellaneous indemnity bond by Ideal. This bond was issued to Guaranty on October 28, 1981. Guaranty would make loans for cars and trucks to individual borrower/buyers through the LoanPower program. Pursuant to the terms of the *210 agreement, Guaranty would apply for an endorsement on the bond for each borrower. It would send an application package to CPI that contained credit information on the borrower. CPI would review the application and decide whether or not to issue an endorsement. Were an endorsement issued, CPI would send the endorsement for that particular borrower to Guaranty but would keep the application documents and the premium paid by the bank. Guaranty would loan the borrower the money and acquire a mortgage on the vehicle. If the borrower defaulted on the loan, Guaranty was to make a timely presentation of notice of default, assign the bank’s rights in the vehicle to Ideal, and make a claim for payment. CPI, acting as agent for Ideal, would either deny the claims or adjust the losses on the claims made to Ideal. Within ninety days of the notice of default, Ideal was to make payment of the principal indebtedness and interest owed at the date of settlement. CPI would then be responsible for repossessing and selling the vehicle and pursuing any deficiency.
Unbeknown to Guaranty, Ideal had entered a reinsurance agreement with AFIC. As part of the same arrangement, AFC agreed to act as surety manager of the LoanPower program. AFC in turn contracted with CPI to administer the Loan-Power program on a daily basis. CPI continued to receive the applications, collect the premiums and deny claims or adjust losses on the claims.
Between October, 1981 and May, 1982, Guaranty submitted a total of 105 claims to CPI and its successor, AFC. CPI handled the claims until January, 1983; AFC handled them after that. In September, 1982, CPI imposed a moratorium on the payment of claims to Guaranty, pending an audit by CPI. Prior to that date, CPI denied payment on numerous claims submitted by Guaranty.
As a result of non-payment of these claims on defaulted loans, Guaranty filed suit in the Nineteenth Judicial District Court against Ideal, CPI, AFC, AFIC and Robert C. Bundren.[1] Prior to trial, the Trial Court ruled that the application packages were not admissible as evidence. The trial court based its ruling on LSA-R.S. 22:618(A), which states that unless the application is attached to, or otherwise made a part of, the policy or contract, it is inadmissible in any action relative to the policy or contract.[2] The application packages consisted of the applications for endorsement under the bond, the vehicle purchase orders/invoices, the credit applications, the LoanPower evaluation forms and the credit reports on each borrower. The application packages were never attached to the endorsements returned to the bank by CPI. The matter was tried to a jury and 88 claims were submitted for consideration. The jury determined that LIGA owed 23 of the 88 claims. Prior to trial, the parties had stipulated on the principal amounts and the accrued interest on each claim. Therefore, the jury did not have to consider the dollar value of each claim. The total amount stipulated as due on the 23 claims was $170,352.53.[3]
The issues raised by appellants’ assignments of error are as follows:
1. Whether the Trial Court erred in refusing to admit into evidence the application for endorsement under the bond, the vehicle purchase orders/invoices, the credit applications, the LoanPower evaluation forms and the credit reports on each borrower on the basis that LSA-R. S. 22:618(A) prohibits their admission into evidence because the documents were not attached to the insurance policy issued by Ideal.
2. Assuming the documents are not admissible under LSA-R.S. 22:618(A), did *211 the Trial Court err in excluding all information contained in the documents by way of other admissible evidence.
3. Whether the liability of LIGA is limited under LSA-R.S. 22:1382(l)(a) to the sum of $50,000.00 less a $100.00 deductible, irrespective of the number of endorsements.
APPLICATION OF LSA-R.S. 22:618(A) LSA-R.S. 22:618(A) provides:
A. No application for the issuance of any insurance policy or contract shall be admissible in evidence in any action relative to such policy or contract, unless a correct copy of the application was attached to or otherwise made a part of the policy, or contract, when issued or delivered. This provision shall not apply to policies or contracts of industrial insurance subject to R.S. 22:213(A)(1) and 22:259(2).
The language of 22:618(A) is very explicit and provides that “no application for the issuance of any insurance policy or contract shall be admissible ... in any action” unless a copy of the application is attached or made a part of the policy.
Louisiana jurisprudence is well settled that applications that are not attached or made a part of the policy are not admissible into evidence. Johnson v. Occidental Life Insurance Company of California, 368 So.2d 1032 (La.1979). In Johnson, the application for insurance was inserted inside the cover of the insurance policy. The court stated that the purpose of the statute was to assure that the insured was in possession of the entire evidence of the insurance contract at all times. The court ruled that the application was admissible because it was “attached to or otherwise made a part of the policy” and the insured had actual possession of the policy. In the case at hand, the application documents remained in the possession of the insurer and the endorsements alone were returned to Guaranty. Therefore, the application documents were never “attached to or made a part of the policy” since actual possession was retained by the insurer.
The insurer can not circumvent 22:618(A) and seek to admit the application documents by urging policy defenses. The Louisiana Supreme Court in Estate of Borer v. Louisiana Health Service & Indemnity Company, 398 So.2d 1124 (La.1981), granted writs to consider whether failure to attach the application to the policy should preclude an insurer from asserting a defense based upon misrepresentation and a pre-existing condition. The Court stated that:
The so-called preexisting condition defense, unlike the misrepresentation defense is a question of contract interpretation. The availability of the defense is not dependent upon statements made by the insured in the application; the question is whether the policy excludes coverage for preexisting conditions. Thus, whether the application is attached to the policy is irrelevant when the defense is based on the preexisting defense exclusion. Borer, 398 So.2d at 1126.
The insurer in Borer attempted to prove from the application that the decedent had died from a pre-existing condition and was excluded from coverage under the terms of the policy. The court stated that failure to attach the application to the policy did not affect the insurer’s right to urge the policy defense that coverage was excluded. Additional language in Borer states that:
[Ujnless the application was attached to the policy when issued and delivered, the application does not become part of the contract, and therefore cannot be admitted into evidence in any action relative to such contract. R.S. 22:618(A). Thus, false statements by the insured in the application cannot be used in evidence if the application is not made part of the contract. Id.
Clearly, the applications for endorsement which were not returned attached to the endorsements, did not become part of the contract and are not admissible into evidence.
ADMISSION OF INFORMATION CONTAINED IN THE DOCUMENTS
By this assignment of error the defendant/appellant complains that it is not *212 allowed to do indirectly what it has been prohibited from doing directly.
LIGA contends that it should have been allowed to use evidence other than the documents themselves in proving their defense. We agree, even though the evidence LIGA seeks to introduce from Mr. Comben and Mr. Coffey, while gleaned from both the records of the insurer as well as the bank and automobile dealership records, is primarily the information contained in the prohibited application packages. However, LIGA seeks to introduce it as having been part of the application documents.
Primarily, Comben prepared two reports based on his review of the bank and automobile dealership records, which reports were nothing more than a synopsis of the credit reports. These are the same credit reporte whose introduction was barred because they were not attached to the policy and therefore, formed no part of the policy and were prohibited under LSA-R.S. 22:618(A).
Coffey compiled “Loan Audit Sheets” on each borrower by reviewing the bank, automobile dealership, and CPI files. The CPI files contained the inadmissible application packages. The “Loan Audit Sheets” were summaries of the documents contained in the application packages but also contained information acquired from admissible evidence. The “Loan Audit Sheets” were not allowed as evidence and Coffey was not allowed to testify as to what information was contained in the documents.
On January 28, 1986 this court issued a writ of mandamus to the trial court vacating the trial court’s judgment of January 22, 1986 and granting plaintiffs motion in limine to prohibit the trial court from allowing the introduction of the application packages which included the credit reports. While the motion in limine excluded only the documents themselves it was the intention of the court of appeal to prohibit the introduction of the documents contained in the application packages, both directly and indirectly. Insofar as the reports prepared by Comben as well as his accompanying testimony are nothing more than a restatement of the inadmissible credit reports themselves, such restatement was not admissible. The “Loan Audit Sheets” and Coffey’s testimony concerning said documents, were clearly not admissible because the documents and testimony were restatements of the inadmissible application documents.
LIABILITY OF LIGA UNDER LSA-R.S. 22:1382(l)(a)
The last assignment of error concerns a question of whether or not each claim for payment submitted under the indemnity bond results in a “covered claim” within the meaning of LSA-R.S. 22:1382(l)(a). Specifically, is the limit of $50,000.00 applicable to each claim for payment or is LIGA’s maximum exposure, for all claims under the indemnity bond $50,-000.00? [4] We find the limit of $50,000.00 is applicable on each separate covered claim.
Each claim sued upon represented a separate application for endorsement, a separate premium, separate credit information on each borrower and a separate endorsement. Upon issuance of the indemnity bond by Ideal to Guaranty, no premium was paid. Premiums were paid for each endorsement issued and therefore, each represented a separate risk to the insurer. In addition, the bond mentions each endorsement and defines “[l]oss” by reference to each endorsement. When a borrower defaulted, the bank was obligated to file a separate “Claim for Payment” for each loss. The trial court was correct in holding that LIGA has liability on each covered claim and that each endorsement constitutes a separate covered claim.
For the above and foregoing reasons, the judgment of the trial court is affirmed. Appellant, LIGA, is to pay all costs.
AFFIRMED.
SHORTESS, J., dissents in part and assigns reasons.

. Bundren was the agent for Ideal and CPI who personally supervised the implementation of the bond program at the bank and furnished Guaranty with operational procedures prescribed by Ideal and CPI.

. The Trial Court preliminarily ruled that the application packages were admissible. The ruling was reversed by the First Circuit by Writ No. 86-0080 dated January 28, 1986.

.The jury also determined that AFC and AFIC owed Guaranty, in solido, a total of $142,403.99; to be offset by $60,195.16 owed by Guaranty to AFIC. AFC and AFIC did not appeal.

. Each claim carried a $100.00 deductible.